IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JEFFREY HALL,<br><br>Plaintiff,<br><br>v.<br><br>VAL BROWN, KEVIN MURRAY, and SALT LAKE CITY,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:20-cv-674<br><br>Howard C. Nielson, Jr.<br>United States District Judge<br><br>FOR PUBLICATION |

Plaintiff Jeff Hall sues Salt Lake Police Department Officers Val Brown and Kevin Murray and the City of Salt Lake, asserting that Officers Brown and Murray deprived him "of his rights protected under the First, Fourth, and Fourteenth Amendments to the United States Constitution," Dkt. No. 2 ¶¶ 98, 108, and that Salt Lake City failed to properly train its officers and that its policies, practices, and customs violate the Constitution, *see id.* at ¶¶ 115–116. Mr. Hall also raises claims under the Utah Constitution. *See id.* at ¶¶ 124. Both officers claim qualified immunity and all defendants move for summary judgment. The court grants the motion.

I.

On December 16, 2017, at approximately 10:30 PM, the Salt Lake City Police Department received two 911 calls about a violent male wedding guest, later identified as Mr. Hall. *See* Dkt. Nos. 24-2; 24-3; 24-5 at 2. Dispatch sent Officers Brown and Murray to the scene, informing them that there was a "domestic disturbance in progress," and that the suspect was

1

"being violent with his wife and others" and possibly intoxicated. Dkt. No. 24-4 at 0:28–1:25 (Radio Dispatch Recording).[1]

Shortly after the two officers arrived at the wedding, Officer Brown spoke briefly to the security guard, who had placed one of the 911 calls, and the guard pointed toward Mr. Hall's location in the parking lot. *See* Dkt. No. 24-7 at 0:00–0:19 (Officer Murray body camera).[2] Both officers then drove across the parking lot and parked approximately 60 feet from Mr. Hall. *See* Dkt. No. 30 at 20. Mr. Hall immediately displayed his middle fingers to the officers. *See* Dkt. No. 31-2 at 1. Officer Brown exited his vehicle and told Hall to "come here and talk to me for a minute." Dkt. No. 24-6 at 0:52–0:56 (Officer Brown body camera). Mr. Hall responded with profanity. *See id.* It is undisputed that at this point, both officers concluded that Mr. Hall was drunk. *See* Dkt. No. 30 at 20. Mr. Hall repeatedly (and profanely) told the officers to call his brother, who he said was a Salt Lake City Police officer. *See id.* at 21.

Up to this point, the distance between Mr. Hall and Officer Brown ranged between ten feet and approximately 20–30 feet. *See* Dkt. No. 24-7 at 1:01–1:31. Mr. Hall largely paced back and forth, gradually increasing the distance between Officer Brown and himself. *See id.* Officer Brown occasionally moved forward but never attempted to close the distance to less than ten feet. *See id.* Officer Brown then told Mr. Hall, "Come here, buddy." *Id.* at 1:28. Mr. Hall

---

[1] The dispatch recording indicates that this information was provided over the radio to units "Charlie 136" and "Charlie 144," both of whom affirmatively responded after receiving these details. *See* Dkt. No. 24-4 at 0:29–0:47. The dispatch log shows that Unit C136 was Officer Brown and Unit C144 was Officer Murray. *See* Dkt. No. 24-5 at 3. Mr. Hall's argument that these officers may not have been aware of the dispatch report is thus foreclosed by uncontroverted evidence.

[2] Because the officers' body cameras are set to preserve video for the 30 seconds before an officer initiates audio recording, the first 30 seconds of the video here—which shows the encounter between Officer Brown and the security guard—do not contain audio. *See* Dkt. No. 23 at 10 n.8.

2

immediately responded, "No," and stated, "I'm not your f****** buddy, you piece of s***." *Id.* at 1:28–1:31. He then began an unmistakable—and, at least apparently, deliberate—advance toward Officer Brown. *Id.* at 1:27–1:34. Immediately after Mr. Hall's exclamation and as he began to move toward Officer Brown, Officer Murray yelled, "Hey! Hey! Hey!" *Id.* at 1:30–1:32. And Officer Brown repeatedly told Mr. Hall to "calm down" as Mr. Hall continued to advance and to direct profanities at Officer Brown. *Id.* at 1:34–1:38.

Mr. Hall advanced to within two feet of Officer Brown before raising his left hand to point at Officer Brown's face. *See id.* at 1:38–1:40. Almost immediately after Mr. Hall raised his hand, Officer Brown grabbed Mr. Hall's left arm and initiated a take-down. *See id*. Mr. Hall landed on his right side and shoulder before ending up on his back. *See* Dkt. No. 24-6 at 1:35–1:38. Officer Brown attempted to gain control of Mr. Hall's right arm while Officer Murray grabbed his left arm. *See id.*; Dkt. No. 24-7 at 1:40–1:47. The entire struggle lasted only a few seconds, but the officers struck Mr. Hall several times in the face during this time. *See id.*

The officers then handcuffed Mr. Hall and eventually moved him into a seated position. His face was bleeding profusely, and blood had pooled on the ground. *See* Dkt. No. 24-6 at 2:00–2:41. Officer Murray called in "medical, crime lab, and an arrest check." Dkt. No. 30 at 27. Mr. Hall was subsequently transported to LDS Hospital for treatment. *See* Dkt. No. 37 at 29. He suffered "orbital skull fractures, facial lacerations, significant subconjunctival hemorrhaging, as well as permanent vision impairments involving double-vision and photophobia" from the incident. *Id.* at 28–29. Mr. Hall has no recollection of the events of that night. *See* Dkt. No. 30 at 30. During the incident, both officers were wearing gloves. Officer Brown was wearing gloves with "high-density padded knuckle and finger protectors," Dkt. No. 37 at 16, and Officer Murray

3

was wearing "Oakley Factory Pilot Gloves" that contained a "protective knuckle guard" and were made of "goat skin, elastane, nylon, rubber, and 3% carbon," *Id.* at 17.

The City subsequently filed a misdemeanor citation for public intoxication against Mr. Hall on December 30, 2017, which was later dismissed without prejudice as untimely filed. *See* Dkt. No. 31-11 at 1–2. On March 2, 2018, Mr. Hall met with the Internal Affairs department of the Salt Lake City Police Department to discuss his desire to pursue a potential misconduct complaint against the officers. *See* Dkt. No. 2 at 16. Three days later, the District Attorney for Salt Lake County filed a four-count information against Mr. Hall. The information charged Mr. Hall with assaulting a peace officer, resisting arrest, public intoxication, and disorderly conduct.[3]

On September 17, 2018, Mr. Hall entered into a plea agreement. *See* Dkt. No. 24-24 at 4. As required by the agreement, Mr. Hall pled no contest to assaulting a peace officer, and his plea was held in abeyance pursuant to Utah Code § 77-2a-1. *See id.* The other counts were dismissed with prejudice. *See id*. As required by his plea in abeyance, Mr. Hall was placed on probation and required to complete community service and continue treatment at the VA. *See id*. at 5. The remaining count was subsequently dismissed with prejudice on April 7, 2021. *See* Dkt. No. 31-12 at 7.

Mr. Hall filed this suit on September 25, 2020.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the

---

[3] The charge for assaulting a peace officer was based on an incident that later occurred at the LDS Hospital: Mr. Hall allegedly attempted to kick another officer in the head. *See* Dkt. No. 24-23 at 2, 4.

4

suit under the governing law"; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When determining whether genuine disputes of material fact exist, a court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Conversely, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. This includes evidence "that is contradicted and impeached" and "evidence that comes from interested witnesses." *Id.* (cleaned up).

"Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quotation omitted). The nonmovant must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (quoting Fed. R. Civ. P. 56(a)).

### III.

The court first addresses Mr. Hall's federal claims against Officers Brown and Murray. Mr. Hall asserts claims under the Fourth, First, and Fourteenth Amendments

### A.

Both officers have invoked qualified immunity. Qualified immunity "shields public officials from damages actions unless their conduct was unreasonable in light of clearly

established law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (quotation omitted). To overcome qualified immunity, "the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

A government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, (1987). There need not be "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. "[T]he legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). The plaintiff faces a "heavy burden" to overcome qualified immunity. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

**B.**

Mr. Hall first claims that the officers employed excessive force during his arrest in violation of the Fourth Amendment. This Amendment guarantees the "right of the people . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. The Supreme Court has held that an arrest is a seizure within the meaning of this Amendment. *See Graham v. Connor*, 490 U.S. 386, 394–95 (1989). As the adjective "unreasonable" suggests, the Fourth Amendment does not prohibit law enforcement officers from using any force in connection with an arrest; to the contrary, the "right to make an arrest or investigatory stop necessarily carries with it the right

6

to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The Amendment does, however, prohibit "excessive force during an investigation or arrest." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *see also Graham*, 490 U.S. at 395–96.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

But "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* (quotation omitted). Rather, whether the use of force complies with the Fourth Amendment turns on the "totality of the circumstances." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985); *see also Graham*, 490 U.S. at 396 (citing *Garner* for this proposition after outlining the three considerations quoted above); *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) ("It is the totality of the circumstances that is the touchstone of the reasonableness inquiry."). Ultimately "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

In *Graham*, the Supreme Court also emphasized that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Drawing from Fourth Amendment decisions in other contexts, the Court explained:

7

> With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (cleaned up). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

Here, the nature of the crime at issue may provide some support for Mr. Hall's claim that the officers used excessive force. Although the dispatch call described Hall as being "violent with his wife and others," Dkt. No. 24-4 at 0:28–1:25, assault is a class B misdemeanor under Utah law. *See* Utah Code § 76-5-102. And under Tenth Circuit precedent, to evaluate the severity of the crime at issue, the court focuses on the crime that the officers had probable cause to believe that Mr. Hall had committed. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011). The Tenth Circuit has repeatedly held that "the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor." *Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018) (collecting cases).

The remaining considerations highlighted in *Graham* tip the scale significantly against Mr. Hall's claim, however. "The second *Graham* factor, whether the suspect posed an immediate threat to the safety of the officers or others is undoubtedly the most important." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017). In this case, the court concludes that Officers Brown and Murray had an objectively reasonable belief that they were in danger when they took Mr.

Hall to the ground and struck him several times during the brief ensuing struggle. *See Saucier*, 533 U.S. at 205.[4]

First, the officers had been informed by dispatch that Mr. Hall had been violent that night with multiple people.[5] Second, although Mr. Hall was visibly (and audibly) agitated from the outset, the tenor of the incident turned more aggressive after Officer Brown told Mr. Hall, "Come here, buddy." Before that, Mr. Hall had maintained at least a ten-foot distance from the officers, telling them not to approach him and to talk to his brother instead. After Officer Brown's remark, however, Mr. Hall started directing insults at the officers (as opposed to just general profanity) and began an unmistakable advance toward Officer Brown that continued until Mr. Hall was within two feet of the officer. And as he advanced, Mr. Hall verbally dismissed defensive action the officers might take, stating, "Oh, what, you going to tase me?" Dkt. No. 24-

---

[4] The court considers the reasonableness of the take down and the subsequent blows together, given that they occurred within seconds of each other without any significant break in the rapidly unfolding incident. Although the Tenth Circuit has at times analyzed officers' use of force in discrete segments, based on a perceived need to analyze the objective reasonableness of the use of force at "the precise moment" that it occurred, *Emmett v. Armstrong*, 973 F.3d 1127, 1136 (10th Cir. 2020), other cases make clear that "strict reliance on the 'precise moment' factor is inappropriate when the totality must be considered," *Thomson*, 584 F.3d at 1318. Whether or not segmented analysis can in some circumstances be squared with the Supreme Court's controlling guidance in *Graham*, *see Hinkley v. Salt Lake City Corp.*, 426 F. Supp. 3d. 1207, 1216–18 (D. Utah 2019), the court has no difficulty concluding that in this case it must consider the totality of the circumstances that led to and occurred during the brief but uninterrupted use of force at issue here.

[5] Mr. Hall maintains that the security guard informed Officer Brown before the officers' encounter with Mr. Hall that Mr. Hall had only "pushed" the guard and another guest and that the guard did not wish to pursue charges. Mr. Hall argues that the officers thus knew that the dispatch reports were overstated at the time they used force against him. The video recording, however, shows that the conversation in which the security guard made these statements to Officer Brown (or an identical one) took place *after* the officers' altercation with Mr. Hall. *See* Dkt. No. 24-6 at 11:00–12:08. Because the video recording of Officer Brown's first interaction with the guard has no audio, it is of course possible that the security guard conveyed the same information to Officer Brown twice. But even if it was conveyed to Officer Brown before his encounter with Mr. Hall, the security guard's information still provided reason to believe that Mr. Hall was willing to use physical force in his current state.

9

6 at 1:29–1:33. Third, once Mr. Hall was within striking distance of Officer Brown, he raised his hand to point his finger at Officer Brown's face. Although the video clearly shows that Mr. Hall did not actually touch Officer Brown, it also shows that Officer Brown began the takedown within a second of Mr. Hall raising his hand. Given what the officers had been told of Mr. Hall's earlier violence that evening, the escalating nature of the incident, Mr. Hall's increasing hostile words, Mr. Hall's apparently deliberate movement to within two feet of Officer Brown, and the sudden movement of his arm toward Officer Brown's face, the court concludes that the officers' "split second judgment" was objectively reasonable. Finally, the body camera video shows that Mr. Hall landed on his right shoulder and then ended up on his back with his arms raised. *See* Dkt. No. 24-6 at 1:36; Dkt No. 24-7 at 1:39.

In light of the rapidly unfolding events, the court concludes that it was objectively reasonable for the officers to believe that Mr. Hall was attempting to assault Officer Brown and then to fight off the officers after the takedown and thus represented a threat to their safety. It follows, for the same reasons, that the officers could have also reasonably believed that Mr. Hall was resisting arrest through these actions.

Measured against this backdrop, the court concludes that the amount of force employed by the officer here—taking Mr. Hall to the ground and briefly delivering several blows that objectively reasonable officers could have intended as compliance strikes to subdue a struggling suspect and effectuate an arrest—does not amount to an unreasonable seizure within the meaning of the Fourth Amendment. And the video further demonstrates that all use of force stopped as soon as Mr. Hall was restrained. While the force used here may seem unnecessary when viewed with the perspective of "20/20 hindsight found in the comfort of a judge's chambers," *Thomson*, 584 F.3d at 1318 (quotation omitted), the Court has repeatedly instructed that "[t]he

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. After considering the totality of the circumstances here from this perspective, the court concludes that Officer Brown and Murray actions were objectively reasonable.[6]

The court rejects Mr. Hall's contrary arguments. First, Mr. Hall argues that he never touched Officer Brown and was never a threat to him. And he further argues that Officer Brown knew this, as evidenced by his statement to Mr. Hall after the incident that the "next time you deal with police, man, you don't get in my face. You understand?" Dkt. No. 24-6 at 4:40–4:42. But of course Mr. Hall has no memory of the events of the evening, so he is unable to offer testimony that would support these assertions. And based on the video footage, the court concludes that a reasonable officer would have believed that Mr. Hall constituted a threat as he approached and moved his arm toward Officer Brown even though he had not at that point touched him. In addition, Officer Brown's subjective interpretation of these events is irrelevant because "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397. In all events, Officer Brown immediately continued, "you don't have the right to get in my face *and try to swing on me,* bro." Dkt. No. 24-6 at 5:05–5:08. This contemporaneous statement confirms that Officer Brown believed Mr. Hall was assaulting him, whether or not this belief was mistaken.

---

[6] Mr. Hall argues that reasonableness is a factual determination for the jury. But this is only true when reasonableness turns on "disputed questions of historical fact." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1254 (10th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 386 (2007)). Because that is not the case here, it is proper for the court to "make the excessive force determination on its own." *Id*.

11

Next, Mr. Hall argues that he never resisted arrest and that the officer's blows were therefore unreasonable. Again, this is not eyewitness testimony based on Mr. Hall's observations and memory, but argument based on his interpretation of the video recording. In their declarations, both officers describe Mr. Hall as rolling onto his back into a "guard position" after reaching the ground. Dkt. No. 24-20 ¶ 4; Dkt. No. 24-21 ¶ 5. The officers assert that Mr. Hall attempted to fight them off from this position and that this resistance justified the blows. *See* Dkt. No. 24-20 ¶ 4; Dkt. No. 24-21 ¶ 5. By contrast, Mr. Hall argues that the video shows him landing directly on his back, and that he thus never rolled into a "guard position" to fight off the officers. The video clearly does show that Mr. Hall landed on his right shoulder and eventually ended up on his back with his arms free. *See* Dkt. No. 24-6 at 1:36; Dkt No. 24-7 at 1:39. But the video does not clearly show how Mr. Hall ended up on his back or whether Mr. Hall was simply flailing in reaction to the officers' use of force or attempting to use a "guard position" to fight off the officers. Accepting Mr. Hall's interpretation of the video recording to the extent the recording is unclear, the court concludes that, given the context of a physical altercation lasting only seconds, the video evidence and Mr. Hall's reported conduct earlier that evening, the officers' belief that Mr. Hall was resisting arrest was objectively reasonable, whether or not it was mistaken. *See Saucier*, 533 U.S. at 205.

Mr. Hall's argument that he could not have resisted arrest because he was never told he was under arrest misreads precedent. Although Mr. Hall relies on *Cavanaugh v. Woods Cross City*, the court in that case explained that Ms. Cavanaugh "had little reason to believe that the officers were responding to a crime." 625 F.3d 661, 665 (10th Cir. 2010). Likewise, the Tenth Circuit explained in *Casey v. City of Federal Heights* that "[t]he absence of any warning—*or of facts making clear that no warning was necessary*—makes the circumstances of this case

12

especially troubling." 509 F.3d 1278, 1285 (10th Cir. 2007) (emphasis added). These cases are readily distinguishable from the circumstances here. Mr. Hall knew, or should have known, that the officers were at the scene responding to his conduct. And his actions towards the officers made clear that no warning was necessary. For example, Officer Murray yelled, "Hey! Hey! Hey!" as the situation grew more volatile and Mr. Hall began to move toward Officer Brown, Dkt. No. 24-7 at 1:30–1:32, and Officer Brown repeatedly told Mr. Hall to "calm down" as he continued his advance, *id*. at 1:34–1:38. Mr. Hall was thus on notice that his actions were escalating the situation.

Last, Mr. Hall argues that the officer's blows were unreasonable because they were wearing protective gloves. The evidence does show that the gloves contained some protective elements, but nothing in the record supports Plaintiff's suggestion that these gloves could have caused significantly more harm than bare knuckles. The court thus cannot conclude that the mere fact that the officers wore gloves specifically marketed to law enforcement officers to protect their hands rendered their otherwise reasonable use of force unlawful.[7]

## C.

Mr. Hall next contends that Officer Brown and Officer Murray used force against him in retaliation for his protected speech. "'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

---

[7] In addition, Mr. Hall has identified no authority holding or suggesting that the use of protective gloves to deliver otherwise permissible compliance strikes to an individual reasonably believed to be resisting arrest is a constitutional violation. Even if Mr. Hall can establish that the use of force here was unconstitutional, he has thus failed to show a violation of a clearly established right as is required to overcome the officers' qualified immunity. *See Wesby*, 138 S. Ct. at 590.

"If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Hartman*, 547 U.S. at 256). Applying this rule, the Supreme Court has held that probable cause to execute an arrest defeats a claim of a retaliatory arrest because the non-retaliatory grounds are sufficient to "provoke the adverse consequences." *Id.* at 1722, 1724.[8]

Although *Nieves* involved an arrest rather than the use of force, the court concludes that the same rule applies here. Because the court concludes that Officers Brown and Murray's use of force was reasonable under the Fourth Amendment, it follows that they had a sufficient non-retaliatory justification for their actions and that Mr. Hall therefore cannot prevail on this claim. And Mr. Hall has not identified evidence that could support a finding that this case falls within *Nieves*'s narrow exception for cases in which officers have sufficient justification to take such action, "but typically exercise their discretion not to do so." *Id.* at 1727.

### D.

Finally, Mr. Hall asserts a claim against Officers Brown and Murray for "fabrication of evidence," Dkt. No. 48 at 2, contending that the officers "made deliberate, material falsehoods for the purpose of generating or influencing subsequent criminal charges against [Mr. Hall]" and that "[t]he prosecution relied on those falsehoods in filing criminal charges against [Mr. Hall]."

---

[8] To whatever extent Mr. Hall seeks to assert a retaliatory arrest claim, this bright line rule bars his claim. Because the court concludes that Officer Brown could have reasonably believed that Mr. Hall had attempted to assault him, Officers Brown and Murray had probable cause by the time of the arrest to believe that Mr. Hall had committed an assault against a peace officer in violation of Utah Code § 76-5-102.4(2)(a)—a class A misdemeanor. And Utah law is clear that "[a] peace officer . . . may, without warrant, arrest a person . . . when the peace officer has reasonable cause to believe a felony or a class A misdemeanor has been committed and has reasonable cause to believe that the person arrested has committed it." Utah Code § 77-7-2(2).

14

Dkt. No. 2 ¶¶101, 101. To prevail on a fabricated-evidence claim, the plaintiff must show that: "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (footnotes omitted).[9] In addition to reciting these elements, the Tenth Circuit explained that the defendant "necessarily must possess knowledge of the evidence's falsity." *Id.* The Tenth Circuit also recognized that when, as here, "the alleged fabrication of evidence was performed by a member of the executive branch," "the deprivation violates due process only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* at 1236 n.4 (quoting *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1190 (10th Cir. 2020)).

---

[9] It is of course well settled that a criminal defendant can "not bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution." *McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019). But to make this showing, "[a] plaintiff need only show that criminal prosecution ended without conviction." *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022) (explaining the requisite showing for a Fourth Amendment malicious prosecution claim). Here, Mr. Hall's prosecution ended without a conviction after his charges were ultimately dismissed. Defendants seek to distinguish *Thompson* on the ground that it addressed a malicious prosecution claim and did not consider the effect of a no-contest plea. *See* Dkt. No. 52 at 4–5. But Defendants make no effort to reconcile *Thompson* with *McDonough*'s equation of a "fabricated-evidence claim to the common-law tort of malicious prosecution." *McDonough*, 139 S. Ct. at 2156. And given that the court ultimately rejects Mr. Hall's fabricated evidence claim on other grounds, it need not determine the proper treatment, under *Thompson*, of a no-contest plea that is held in abeyance. In all events, under *Truman*, the requirement that a "defendant's conviction or sentence has been invalidated or called into doubt" applies only "if the alleged unlawfulness would render a conviction or sentence invalid." *Truman*, 1 F.4th at 1236. Here, Mr. Hall never received a conviction or sentence so there is nothing that the alleged unlawfulness could render invalid. *Cf. id.* at 1236 n.5 ("Although a plaintiff's conviction based in part on the presentation of fabricated evidence at trial is evidence that he or she was deprived of a fair trial, it is not crucial to a § 1983 fabrication of evidence claim. An acquitted plaintiff may have been deprived of liberty due to fabricated evidence if there is a reasonable likelihood that without the fabricated evidence, the plaintiff would not have been criminally charged.").

15

To determine whether this claim survives summary judgment, the court must thus assess whether any allegedly fabricated evidence was used against Mr. Hall and whether any such use violated due process. Here, the declaration of probable cause filed by Officer Coles in connection with the Information relied on Officer Brown's statement. *See* Dkt. No. 24-23 at 3. In pertinent part, the declaration of probable cause states that

> Officer Brown attempted to speak with the defendant from a distance. The Defendant told Officer's to "f*ck off" and gestured to them with his middle fingers. Defendant became more aggressive and walked towards Officer Brown coming within one foot of him, the defendant threw his hands up with balled fists and stated, "What are you going to do, tase me?" Defendant then attempted to poke Officer Brown in his chest with his finger. Due to the defendant's aggressive actions, Officer Brown and Officer Murray attempted to gain control of the defendant and took him to the ground. Defendant was resisting and rolled onto his back in a "guard position" as the officers were trying to restrain him.

*Id.* at 3–4.

There are at most minor discrepancies between this statement and what is clearly depicted in the body cam video. For example, it is unclear whether Mr. Hall came within one foot of Officer Brown or two; the video does not depict Mr. Hall balling his fists when he stated "[w]hat are you going to do, tase me?"; it does not appear that Mr. Hall was attempting to poke Officer Brown in the chest when he raised his finger toward him; and it is unclear how Mr. Hall ended up on his back and whether he was actively resisting or simply flailing. Although Mr. Hall argues that the officers *knew* that these assertions were false, he has no independent recollection of the events of the evening and thus his statements reflect his arguments regarding what is depicted in the body cam video; they are not actual eyewitness testimony or any other sort of competent evidence.

But even assuming that reasonable jury could agree with Mr. Hall that any minor discrepancies between Officer Brown's statement and what is depicted on the body cam video constitute deliberate falsehoods rather than imperfect recollection of some of the details of an

16

event that transpired nearly three months earlier, the court concludes that as a matter of law any slight mischaracterization here cannot be described "as arbitrary, or conscience shocking, in a constitutional sense.'" *Truman*, 1 F.4th at 1236 n.4. To meet this standard here, Mr. Hall "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Uhlring v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). Instead, he must show that Officer Brown's conduct manifest "a degree of outrageousness and a magnitude of potential harm that is truly conscience shocking." *Id.* "[O]nly the most egregious official conduct" meets this standard. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). After all, the statement depicts a version of events that, while favoring the officers, is largely consistent with body camera footage in the record. It is not so flagrantly divorced from reality as to shock to the conscience.

Officers Brown and Murray thus did not violate the Due Process Clause of the Fourteenth Amendment.

## IV.

The court next considers the claim for municipal liability asserted against Salt Lake City. *See* Dkt. No. 2 ¶¶ 115–121. "It is well settled that a municipality may not be held liable under Section 1983 where there was no underlying constitutional violation by any of its officers." *Hinkley*, 426 F. Supp. 3d at 1220 (cleaned up). Because Officers Brown and Murray did not violate the Constitution, "Defendant Salt Lake City Corporation cannot be held liable under Section 1983." *Id*. (cleaned up).

## V.

"The Tenth Circuit has explained that when all federal claims have been dismissed, the court may, and usually should, decline to exercise supplemental jurisdiction over any remaining

state claims." *Reyes v. N.A.R. Inc.*, 546 F. Supp 3d 1031, 1042 (D. Utah 2021) (cleaned up); *see also* 28 U.S.C § 1367(c)(3). Because the court has determined that the Defendants are entitled to summary judgment on all of Mr. Hall's federal claims, it will follow the Tenth Circuit's guidance and dismiss Mr. Hall's state law claims without prejudice.

\* \* \*

For the foregoing reasons, the court **GRANTS** Defendants' motion for summary judgment with respect to all of Plaintiff's claims that allege violations of the United States Constitution. Plaintiff's state-law claims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

DATED this 29th day of August, 2022

Howard C. Nielson, Jr.
United States District Judge